**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ALAN PLOFSKY                          :
     Plaintiff,                      :
                                    :    CIVIL ACTION NO.
v.                                    :    06-cv-0789(JCH)
                                    :
ROSEMARY GUILIANO, ET AL.,            :
     Defendants.                     :    MARCH 26, 2009
                                    :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 56)**

**I.     INTRODUCTION**

Plaintiff Alan Plofsky brings this claim against the defendants Rosemary

Guiliano, Richard Vitarelli, Christopher Smith, John O'Connor, Gary Collins, Helen Z.

Pearl, Scott Storms, and Hugh MacGill (collectively "defendants"), each in their

individual capacities, alleging violations of his rights pursuant to 42 U.S.C. §1983.

Plofsky was put on administrative leave and eventually terminated from his employment

as the Executive Director and General Counsel of the Connecticut State Ethics

Commission ("SEC").  Plofsky claims that his termination was motivated by the exercise

of his rights under the First Amendment.  Additionally, he alleges that he was denied

pre-disciplinary due process rights in violation of the Fourteenth Amendment.

Defendants move for summary judgment on both of Plofsky's claims.

**II.    STANDARD OF REVIEW**

In a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once

1

the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.   FACTUAL BACKGROUND[1]

On March 1, 1988, Plofsky was appointed to serve as Executive Director and General Counsel of the SEC. He held that position until his termination on September 24, 2004. Defendant Rosemary Guiliano was the Chairperson of the State Ethics Commission during the times relevant to Plofsky's Amended Complaint. Defendant Richard Vitarelli was the Vice Chairperson of the SEC during the relevant time period. Similarly, at all times relevant to this case, defendants Helen Pearl, Scott Storms, John O'Connor, Gary Collins, Hugh MacGill, and Christopher Smith all served as

---

[1] For the purposes of the instant Motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support his allegations.

2

commissioners of the SEC.

     A.    <u>Comments Regarding Governor Rowland</u>

On January 16, 2004, the SEC held a special meeting.  At this time the SEC was investigating a controversy surrounding then-Governor Rowland's potential violation of the gift provisions of the State's Ethics Code.  Certain actions taken at this meeting created a "significant public misunderstanding" regarding the SEC's position related to Governor Rowland.  Def's. Exh. 3.  As a result, on January 26, 2004, the SEC released a statement regarding its "no comment" policy.  <u>Id.</u>  The policy provided that the Chairperson of the SEC would be the sole spokesperson on the SEC's "position regarding staff comments directly related to Governor Rowland and the Ethics Code's gift provisions."  <u>Id.</u>  This statement was drafted and faxed by Plofsky to Guiliano on January 23, 2004 for review, comment, and reply prior to its official posting.  Def.'s Exh. 4.

On June 3, 2004, Plofsky delivered a speech at the annual luncheon meeting of the Litchfield County League of Women Voters ("LWV").  He participated in this event as part of his duties as Executive Director of the SEC.  Two members of the news media were present at the speech and subsequently wrote two news articles about the speech, one of which was entitled "Ethics Chief Hammers Rowland."  Def.'s Exh. 5.  On June 7, 2004, Plofsky wrote a memorandum to the SEC commissioners stating that he was unaware, until after his remarks, that two news reporters were in the audience.  <u>Id.</u> In this memo, Plofsky defended his speech, stating that he did not comment on Rowland's pending complaint before the SEC, but did comment on two past matters involving Governor Rowland.  <u>Id.</u>  On June 14, 2004, personal counsel to Governor

3

Rowland, Attorney William Dow, wrote to Guiliano pointing out that Plofsky's

statements, as reported in the <u>Litchfield Register Citizen</u>, "violate" a section of the

Ethics Code and the SEC's "order with respect to public comment" on Rowland.  Def.'s

Exh. 6.  He requested that Guiliano "act[] on this promptly."  <u>Id.</u>

On June 29, 2004, Plofsky went to the SEC to meet with five of the

commissioners.  Pl.'s Exh. AA at 1825.[2]  The meeting was not a formal meeting; all

commissioners were not present.  <u>Id.</u>  After speaking with Plofsky about the LWV

speech, these five commissioners held a meeting about Plofsky without him present.

<u>Id.</u> at 1826.  Shortly after, Guiliano and Smith sat down with Plofsky and asked if he

would accept a two week suspension.  Plofsky Dep. at 67-68.  Plofsky informed them

that he wanted to think about it.  <u>Id.</u>  It was Plofsky's understanding that he had no

choice in the matter and that the SEC had determined to suspend him.  <u>Id.</u>  In a letter

dated July 1, 2004, Plofsky notified Guiliano that he decided to retain counsel "in

response to the [SEC]'s proposed personnel action."  Def.'s Exh. 7.

On July 7, 2004, the <u>Hartford Courant</u> published an article stating, <u>inter alia</u>, that

Plofsky retained Attorney Gregg Adler "to fight the proposed disciplinary action."  <u>See</u>

Plofsky Aff. ¶ 6.  The article also paraphrased Adler as saying the SEC "had not

provided Plofsky with his 'due process rights'–such as proper notice that discipline was

being considered, and the chance for legal representation to argue against it."  <u>Id.</u>

Also on July 7, after considering Guiliano's request for advice and representation

in the Plofsky employment matter, Attorney General Richard Blumenthal indicated by

---

[2] Exhibit AA is compiled testimony from proceedings held before the Connecticut Employee's
Board on March 1, 2005.  These specific pages refer to the testimony of Brenda Lou Mathieu.

letter that, if the SEC proceeded with disciplinary action, his office would decline representation.  Def.'s Exh. 8.  Guiliano was advised by Blumenthal that she had the option of utilizing the services of the Office of Labor Relations.  Id.  This letter was faxed to Guiliano at the SEC office.  Def.'s Exh. 9.  The fax cover sheet contains a standard notice warning that the documents may contain confidential or privileged information and should not be distributed by anyone other than the recipient.  Id.

Earlier that morning, the SEC had received a Freedom of Information Act ("FOIA") request from the Hartford Courant for documents related to Plofsky's personnel matter.  Pl.'s Exh. AA at 153.  After the fax came in, Brenda Lou Mathieu, the Director of Disclosure for the SEC, Brenda Bergeron, an attorney for the SEC, and Plofsky discussed whether or not the letter from Blumenthal was a public document, and thus whether it should be forwarded to the Hartford Courant pursuant to the FOIA request.  Id.  It was Mathieu's feeling that Bergeron and Plofsky agreed it was a public document because the letter did not specifically indicate that it was confidential.  Id. at 154.  Shortly thereafter, Plofsky expressed to Mathieu that he could not have a role in the decision because of a conflict of interest.  Id. at 155.  When Bergeron and Mathieu went to fax the letter to the Courant, according to Mathieu, Bergeron expressed some reservation in the decision to disclose it, but at that point Mathieu believed everyone was in agreement that it was public so she faxed it to the newspaper.  Id. at 155-6.  In September 2004, Mathieu signed an Affidavit describing a slightly different set of events.  Most notably in her Affidavit, Mathieu indicated unequivocally that Plofsky directed Bergeron to fax the letter to the Hartford Courant.  Def.'s Exh. 10.

After receiving the letter from Blumenthal, Guiliano wrote a letter in response

5

requesting that any communications by her to his office, as well as any advice given to her, including the July 7 letter, be confidential as "attorney-client privilege."  Def.'s Exh. 11.  On July 8, 2004, Blumenthal responded to Guiliano, stating that he did not make the July 7 letter public.  Def.'s Exh. 12.  The letter also stated that his July 7 letter "was based on factual representations contained in published reports and not on facts that you have discussed with Assistant Attorney General Cobb."  Id.  In other words, he did not feel that the letter was subject to the attorney-client privilege.  Id.

The next day the SEC held its monthly meeting.  Def.'s Exh. 13.  At this meeting, Plofsky formally recused himself from acting as the SEC's general counsel and Bergeron replaced him in that capacity.  Id.  The SEC moved to go into executive session "to discuss strategy and negotiations with respect to pending claims and litigation for which this agency or a member is a party."  Id.  Plofsky stated that, if the executive session was about him, he would waive the right to confidentiality so that the meeting could be held in public.  Id.  Bergeron briefed the SEC on the application of FOIA requirements to executive session proceedings.  Id.  Her comments were based on discussions she had with FOI attorneys.  Plofsky Aff. ¶ 12.  She informed the SEC that, "under Conn. Gen. Stat. § 1-200(6), if the Ethics Commission wished to discuss a personnel matter regarding a specific individual, that individual would have to receive prior 'reasonable notice' of the meeting, and must be given the opportunity for the meeting to be held publicly."  Id.  Bergeron also told the SEC that in a discussion with Colleen Murphy, the Deputy Director of the FOI Commission, she learned that "a letter from the subject of the personnel matter stating that he has retained legal counsel and will be meeting with that counsel is not sufficient to warrant going into executive session

on the 'pending claim or litigation claim.'" Id.  Despite this, the commissioners unanimously went into executive session.  Def.'s Exh. 13.  During the July 9 SEC meeting, there was also discussion about the SEC's need to retain legal counsel to "pursue resolution of a personnel matter."  Def.'s Exh. 13.  The events of the public portion of this meeting were reported in the Hartford Courant the next day.  Plofsky Aff. ¶ 13.

On July 12, 2004, Blumenthal sent a letter to Governor Rell in response to her request to determine whether the SEC "adhered to applicable state statutes and regulations when it informed Plofsky . . . of the Commission's desire to suspend him without pay for two weeks" as a result of the comments he made at the LWV luncheon. Def.'s Exh. 14.  This letter reiterated Blumenthal's position that it would not represent the SEC "if it pursues the proposed disciplinary action" against Plofsky.  Id.  It further stated his opinion that the SEC "must completely abandon its proposed action against" Plofsky.  Id.  He went on to cite and summarize the relevant case law regarding First Amendment and Due Process principles and law.  Id.  Finally, Blumenthal expressed his opinion that there is reason to doubt that the SEC followed the proper due process procedures.  Id.  Subsequently, Guiliano's request to the Office of Policy and Management for funding to retain outside counsel was denied.  Def.'s Exh. 14 at 6-7. The SEC was ultimately represented by Linda Yelmini, the Director of Labor Relations, Office of Public Policy and Management.

On July 23, 2004, the SEC held a special meeting at which the potential disciplinary action against Plofsky was discussed.  Def.'s Exh. 15.  Attorney Yelmini as well as Attorney Adler, Plofsky's counsel, were present at this meeting.  Id.  Yelmini

testified that the meeting was to discuss a draft stipulated agreement.  Def.'s Exh. A at

36.  At the start of the meeting during the public portion, at which members of the press

were present, Guiliano stated "may the record reflect Mr. Adler that you have already

made several comments to the press with respect to that [June 29] meeting and this is

the first opportunity the Commission has to respond to the comments that you have

made to the press."  Plofsky Aff. ¶ 16.  The SEC went into executive session without

objection from Adler to discuss the stipulated agreement.  Def.'s Exh. 15.  Upon

returning to a public session, the stipulated agreement was accepted upon motion and

signed by Plofsky and Guiliano.  Id; see also Def.'s Exh. 16.  Also at this meeting, Adler

stated that Plofsky played no role in the Attorney General's July 7 letter or its release to

the press.  Def.'s Exh. 15.

     B.     Whistleblower Complaints

On August 12, 2004, three principal SEC attorneys, Bergeron, Alice Sexton, and

Maureen Regula, submitted a handwritten memorandum to the Auditors of Public

Accounts wherein they requested whistleblower status and confidentiality.  Def.'s Exh.

17.  Attached to the memorandum was an anonymous note addressed to Guiliano from

someone who claimed to work in the parking lot who wanted to report misuse of state

time by SEC employees.[3]  Id.  The note raised questions about misuse of employee

work hours, among other things.  Id.  On this same day, Bergeron, Sexton, and Regula

shared their concern that Plofsky did not correct Adler at the July 23 meeting when he

---

[3] It was later revealed that this anonymous letter was written by Regula.  Pl.'s Exh. DD, Duggan (nee Regula) Dep. at 39-44.  She drafted it at home and had a discussion with her then-husband about sending it but ultimately decided not to.  Id.  However, according to Regula, her husband sent it without her knowledge.  Id

said that Plofsky played no role in the dissemination of the July 7 letter.  The three attorneys "expressed their hope" that Plofsky would correct the record at the August 13 SEC meeting.  Bergeron Aff. ¶ 11; see also Sexton Aff. ¶ 9-10; Regula Aff. ¶ 14.  They further relayed that, if he did not correct the minutes, they would then each come forward with their specific recollections.  Id; see also Sexton Aff. ¶ 9-10; Regula Aff. ¶ 14.  It is undisputed that Plofsky did not correct the minutes.  The following day, the three attorneys went to the Auditor's Office to relate additional information.  See, e.g., id.

In response to the whistleblower complaints, the Office of the State Auditor issued a memorandum summarizing the complaints about Plofsky.  Def.'s Exh. 18.  The complaints included the fact that Plofsky typically came into work at 9 a.m. and left by 3:30 p.m., but that he sometimes worked from home and rarely took vacation.  Id. Additionally, the memo stated that Plofsky instructed the complainants to prepare two time sheets, one that reflected actual work hours and the other, to be submitted to the auditors, would reflect eight hour work days.  Id.  The complainants also informed the auditors that there had been a delivery of desks and computer equipment to the office despite the fact that it was their understanding that they were on a tight budget.  Id.

On August 13, the SEC held its monthly meeting.  Guiliano stated, in an email, that the Clerk of the Commission asked her to prepare the agenda for the meeting, even though the staff was usually responsible for the agenda.  Def.'s Exh. 19.  During this meeting, the SEC went into executive session pursuant to Conn. Gen. Stat. 1-200(6)(A) for the "purposes of discussing the appointment, employment, performance, evaluation, health or dismissal of a public officer or employee . . . ."  Def.'s Exh. 20.  It

9

was at this meeting that Plofsky saw the anonymous note for the first time.  Yelmini was invited to participate in the closed session regarding the pending personnel issues; Plofsky and others had no objection to this.  When the SEC returned to public session, Vitarelli made a motion "concerning certain allegations that were made against Mathieu and Plofsky."  Def.'s Exh. 20.  The SEC then asked Alan Mazzola, of the Department of Administrative Services, to investigate the allegations and report his findings to the SEC.  Id.

A special meeting of the SEC was held on August 20, 2004, where the SEC went into executive session for the purposes of discussing the whistleblower complaints with Yelmini and the members of the SEC.  Def.'s Exh. 21.  At this meeting, Plofsky requested a redacted copy of the whistleblower complaints.  Id.  He also requested that he be present for the conclusion of the executive session, which request was granted. Id.  He was advised of the issues that the SEC were discussing in the executive session.  Id.  In public session, the SEC decided to put Plofsky on administrative leave for up to fifteen days, pending the investigation of the whistleblower complaints.  Id. Plofsky objected.  Id.  His request for a redacted version of those complaints was also denied.  Id.  On August 31, 2004, the Hartford Courant published the names of the three whistleblowers and reported on the pending investigation.  Def.'s Exh. 26.

C.    Pre-Disciplinary Hearings and Termination

Mazzola scheduled an interview with Plofsky for September 2, 2004.  Adler requested a list of the specific allegations made against Plofsky in advance of this meeting.  Plofsky Aff. ¶19.  Mazzola denied the request and quoted the Attorney General's Opinion 2002-25 by stating that "there is currently no due process duty to

10

disclose because the request has been made at the investigatory stage and the alleged wrongdoer has not been terminated, suspended, or arrested." Def.'s Exh. 27. It is disputed as to why Mazzola denied the request. Defendants argue that Yelmini instructed the commissioners and Mazzola not to disclose the Affidavits. Tr. Oral Arg. (2/26/09) at 22/20-12[4] (defense counsel stating that it is undisputed that Yelmini advised the commission not to disclose the Affidavits.). Yelmini states that she had numerous conversations with the Attorney General's Office about whether she could disclose redacted complaints, and the Office advised her that she could not. Def's Exh. B at 40-52. On the other hand, according to the Office of the Attorney General, the first communication on record with Yelmini regarding Plofsky was on September 8, 2004. Pl.'s Exh. CC at 6. On August 23, 3004, Guiliano faxed redacted copies of the whistleblower Affidavits to Plofsky. Def.'s Exh. 24.

On September 8, 2004, the SEC held a special meeting, portions of which were held in executive session. In open session, Guiliano, in consultation with Yelmini, was authorized to draft a pre-disciplinary notice to Plofsky and designated September 10, 2004 for a pre-disciplinary hearing. In that Notice, Plofsky was advised that he had the right to have counsel present at the hearing. Plofsky denies that he was given the opportunity to attend the September 8 meeting. Pl.'s Exh. BB, ¶ 20.

On this same day, Guiliano wrote a letter to Plofsky noticing him of the charges against him. The four items alleged were:

1. Telling a staff member to lie if they were asked questions in response to a federal subpoena;

---

[4] Cites to Oral Argument transcript are to page/line

11

2. Instructing a staff member to destroy a tape of a commission meeting;

3. Failing to inform the Commission that [he] directed that a letter from the Attorney General (potentially privileged) be disseminated to the <u>Hartford Courant</u>; and

4. Accruing compensatory time in violation of state policies governing managerial employees.

Def.'s Exh. 32.  On September 10, 2004, the SEC held a <u>Loudermill</u> hearing concerning these charges.  At the hearing, Plofsky was represented by Adler, the SEC was represented by Yelmini, and Mazzola presented his findings.  At this hearing, Plofsky responded to the four charges listed in the <u>Loudermill</u> notice.  Def.'s Exh. 34 at 33-53. Later in the hearing, Adler criticized the SEC for receiving Mazzola's report in the closed September 8 meeting.  <u>Id.</u> at 57-58.  He also objected to Mazzola publicly presenting his findings at the September 10 hearing, especially because Plofsky had already spoken without the benefit of hearing Mazzola's report.  <u>Id.</u>

At the end of the September 10 hearing, the SEC commissioners present unanimously[5] found that Plofsky should be terminated.  Def.'s Exh. 33.  On this same day, Guiliano notified Plofsky by letter that he was dismissed from State service effective September 24, 2004.

On September 23, 2004, a fax was sent by the attorney for Cindy Cannata and Mathieu to Adler and Yelmini in order to clarify statements made in their prior Affidavits. Def.'s Exh. 39.  Both letters depicted Plofsky in a better light than had been the case in their previous Affidavits.[6]  On September 24, 2004, Adler faxed a request to Guiliano

---

[5] Commissioners MacGill and Storms were absent from the September 10 hearing.

[6] Cannata had provided an Affidavit regarding the second charge against Plofsky --that he had directed her to destroy a tape.  In her second Affidavit, she suggested that the day after she signed the

requesting that the SEC reconsider its decision to terminate Plofsky.  On September 27, 2004, Plofsky was provided with redacted copies of the whistleblower Affidavits. Two days later, the SEC held a special meeting to address Adler's request for reconsideration.  At this time, MacGill was the new Chairperson of the SEC as Guiliano tendered her resignation on September 23 to be effective on September 24, 2004.

At the meeting, MacGill requested that Adler confine his arguments to how the new Affidavits from Cannata and Mathieu "materially change the basis upon which the commission based" its decision to terminate Plofsky.  Def.'s Exh. 44 at 5.  During this meeting, Adler requested that Vitarelli recuse himself from the reconsideration due to the fact that he previously noticed his resignation to take effect on September 30, 2004, when his term expired.  Id. at 7.  Mr. Vitarelli declined to do so.  Id. at 7-8.  Adler also requested Smith to recuse himself; he also declined to do so.  Id. at 16-18.  At this meeting, Mazzola discussed his investigation, and he and Yelmini answered questions from the commissioners.  Ultimately, the decision to terminate Plofsky was reaffirmed by the SEC.

On October 1, 2004, Adler notified Yelmini that Plofsky was filing a grievance. On October 5, Plofsky filed an appeal of his dismissal with the Employees' Review Board ("ERB").  After numerous dates of hearings and testimony from numerous people, the ERB issued a Memorandum of Decision on March 31, 2006, that held

---

first Affidavit she had expressed concern that some of her statements may have been misleading and that Plofsky would not expect her to lie or destroy a tape.  Def.'s Exh 39, Cannata Aff ¶ 4.  She also stated that, prior to the September 10 meeting, she had sent a letter to Guiliano expressing the same.  Id. at ¶ 5.

Mathieu's Affidavit concerned Plofsky's involvement in the faxing of Blumenthal's July 7 letter to the Harford Courant.  In her second Affidavit, she suggested that she was uncomfortable with the phrase "Plofsky directed . . . Bergeron to fax the letter."  Id; Matheiu Aff. ¶ 7.  She stated that she never used those words to describe what happened.  Id.

Plofsky's termination was without reasonable cause.  Def.'s Exh. 52.  As a result, Plofsky was awarded all retroactive salary and benefits, and the ERB ordered that he be reinstated to active employment with the State of Connecticut.  Id.

## IV.  DISCUSSION

### A.  First Amendment

It is well established that "public employees do not surrender all their First Amendment rights by reason of their employment."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  However, "[i]n measuring the extent of this right, the interests that must be carefully balanced are the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003) (quoting Pickering v. Bd. of Educ., 381 U.S. 563, 568 (1968)) (internal quotations omitted).  The Supreme Court has identified a two part inquiry to determine whether a public employee's First Amendment right to free speech has been violated.  The first part of the inquiry "requires determining whether the employee spoke as a citizen on a matter of public concern."  Garcetti, 547 U.S. at 418; see also Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008).  If the answer is no, the public employee's First Amendment cause of action fails.  Garcetti, 547 U.S. at 418.  If the answer is yes, this first part of the inquiry then requires asking whether the speech was a motivating factor in the adverse employment decision.  Ruotolo, 514 F.3d at 189.  If causation can be established, then the second part of the inquiry is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."

14

<u>Garcetti</u>, 547 U.S. at 418.

        1.   <u>Public Concern</u>

     "Whether an employee's speech addressed a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." <u>Ruotolo</u>, 514 F.3d at 189 (citing <u>Connick v. Myers</u>, 461 U.S. 138, 140 (1983)). "The heart of the matter is whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose." <u>Id.</u> (internal quotations omitted). "A generalized public interest in the fair or proper treatment of public employees is not enough." <u>Id.</u> at 190.

     "As a general rule, speech on any matter of political, social, or other concern to the community is protected by the First Amendment." <u>Mandell v. County of Suffolk</u>, 316 F.3 368, 383 (2d. Cir. 2003) (finding that plaintiff's testimony regarding "the department's approach to fighting organized crime, its resistance to change, and its systematic racism and anti-Semitism" were all matters of public concern) (quoting <u>Connick</u>, 461 U.S. at 140) (internal quotations omitted). Furthermore, the Supreme Court has stated that "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." <u>City of San Diego v. Roe</u>, 543 U.S. 77, 83-4 (2004) (holding that a police officer's off-duty expression of selling sexually explicit videotapes of himself did not relate to a matter of public concern).

     As an initial matter, the statements and actions that Plofsky is claiming are protected by the First Amendment are:

1.      The act of hiring Adler to represent him;

2.      Comments published in early July that Adler made stating that the SEC had not provided Plofsky with his due process rights, including proper notice of the June 29 meeting that discipline was being considered nor was he given opportunity to be heard and argue against it with the help from a legal representative;

3.      Adler's comments published in early July that Plofsky had a right to have the closed session meeting attended by five commissioners on June 29 held in public;

4.      Plofsky's comments at the July 9 meeting that the SEC was not following FOIA requirements when it had a meeting in executive session on July 9, despite the fact that Plofsky requested that it be public.

See, e.g., Tr. Oral Arg. (2/26/09) 1/23-3/14.  He argues that all of these statements and action are protected activities because they regard matters of public concern as evidenced by the extensive coverage of the matter in the media.  See, e.g., Mem. in Opp. at 21-22.

Defendants argue that, as a matter of law, Plofsky's speech is not protected because his comments and actions were made to redress his personal grievances, rather than to address matters of public concern.  The defendants cite Ruotolo to support this claim.  In Ruotolo, the plaintiff was a sergeant with the New York Police Department, who was assigned to investigate a newspaper report of possible contamination and health risks at the precinct.  514 F.3d at 186.  He subsequently issued a report that identified a large number of cancers, miscarriages, and birth defects afflicting individuals working in the precinct and ultimately recommended a thorough environmental evaluation, which was done.  Id.  Ruotolo claimed that soon after the report he began experiencing on-the-job retaliation.  In his lawsuit, he claimed the report as speech protected by the First Amendment.  Id. at 187.  He also claimed

that the act of filing a lawsuit after being fired for the report was protected under the First Amendment.  Id.  In light of the decision in Garcetti, 547 U.S. 410, in which the Supreme Court held that the First Amendment does not protect government employees from retaliation for speech made in their official capacity, the court could only address whether Ruotolo's lawsuit amounted to speech on a matter of public concern.  Ruotolo, 514 F.3d at 189.  The Routolo court held that, because the "lawsuit concerns essentially personal grievances and the relief he seeks is for himself alone, the lawsuit is not speech on a matter of public concern."  Id. at 190.

In addition to Ruotolo, the defendants rely on Ezekwo v. NYC Health and Hospitals, Corp., 940 F.2d 775 (2d Cir. 1991), for support that Plofsky's alleged protected speech does not address matters of public concern.  The plaintiff in Ezekwo was a medical doctor participating in a resident program at the defendant hospital.  She alleged that she was denied the position of Chief Resident in retaliation for written and verbal communications and complaints that she made to her supervisors.  Id. at 777.  Her claimed protected speech included complaints that the attending physicians failed to be present at specific times, the lack of personal attention she received from attending physicians, poor teaching methods, lack of opportunity to perform surgery, and the manner in which she was treated by the chief of the department.  Id. at 777-8.  The Second Circuit held that this speech was not protected by the First Amendment because her complaints were "personal in nature and generally related to her own situation within [the hospital] residency program."  Id. at 781.  It continued, "the mere fact that one or two of Ezekwo's comments could be construed to broadly implicate matters of public concern does not alter the general nature of her statements."  Id.

Defendants contend that, like <u>Ruotolo</u> and <u>Ezewko</u>, Plofsky's claims all concern his personal grievances because they relate to his own proposed discipline.  In determining whether speech is on matters of public concern, the court must consider "content, form, and context of a given statement, as revealed by the whole record." <u>Connick</u>, 461 U.S. at 147-8.  Accordingly, the mere fact that the speech was of a personal interest to Plofsky does not remove the speech from the protection of the First Amendment.  <u>Johnson v. Ganim</u>,  342 F.3d 105, 114 (2d Cir. 2003)(finding that letter written by city employee accusing the administration of harassment, <u>inter</u> <u>alia</u>, was on a matter of public concern).  In arriving at this conclusion, the <u>Johnson</u> court stated, "[a]ccepting as true the proposition that a matter is not of public concern if it personally and directly affected the speaker would mean that only those persons with the least amount of firsthand knowledge about the subject matter could utter speech without fear of government reprisal."  <u>Id.</u>

An employee's motive in making the speech is also not dispositive.  <u>Reuland v. Hynes</u>, 460 F.3d 409, 418 (2d Cir. 2006).  In <u>Connick</u>, the seminal case on whether speech relates to matters of public concern, an assistant district attorney circulated a questionnaire in her office after being told that she was being transferred to another department.  461 U.S. at 140-1.  The court found that most of the questions in a district attorney's questionnaire concerned personal, not public matters, and were motivated by her desire to "gather ammunition for another round of controversy with her superiors." <u>Id</u> at 148.  However, it did find that one question--whether the assistant district attorneys felt pressure to work on political campaigns--did address a matter of public concern.  <u>Id.</u> at 149-150.  Thus, her motivation to antagonize her superiors was not dispositive.

18

Defendants are correct in asserting that, in order to be considered a matter of public concern the speech must reach beyond matters of personal interest, <u>see</u> Mem. in Supp. at 14, but personal interest need not be completely removed from the speech. <u>Reuland</u>, 460 F.3d at 418.  In <u>Reuland</u>, the court found that a prosecutor's statement regarding the crime rate in the jurisdiction where he worked was protected by the First Amendment because it related to a matter of public concern.  <u>Id.</u>  The fact that the speech related to crime, a clear matter of public concern, and was made to a magazine with public circulation and not just to coworkers, made it more than just speech on personal matters.  <u>Id.</u>  Similarly, in <u>Johnson</u>, the plaintiff employee sent a letter to the city administration criticizing the administration for discrimination, harassment, nepotism, and intimidation, among other things.  342 F.3d 1095, 108.  Notwithstanding the fact that Johnson admitted that all of the things he complained of happened to him, the court found the speech in the letter to be on matters of public concern.  <u>Id</u>. at 114.  In arriving at this conclusion, the court stated that the "thrust of the speech" was "aimed at the alleged system-wide epidemic."  <u>Id.</u>  It further stated that the speech was on a matter of public concern because the letter requested that the administration take action, and the benefit of such action would "inure more to the group than to him specifically."  <u>Id.</u>

The court finds that the question of whether Plofsky's claimed speech addresses a matter of public concern is a close one.  On the one hand, his statements were covered extensively in the local newspapers, which demonstrates public interest in the matter.  On the other hand, his statements all concern, in one way or another, his own discipline.  In other words, when Plofsky was criticizing the SEC and pointing out its

19

claimed substantive and procedural violations, he was doing it in relation to his own disciplinary process.  The mere fact that Plofsky had a personal interest in the matter, however, should not necessarily take it out of the realm of public concern.  See, e.g., Johnson, 342 F.3d at 114.

Taking into account the content, form, and context of Plofsky's statements,[7] as revealed by the whole record, Connick, 461 U.S. at 147-8, the court finds that, as a matter of law, Adler's comments made in early July regarding the fact Plofsky had a right to have the June 29 meeting in public is on a matter of public concern.  See number 3, supra, at 16.  While the claimed speech, on its own, appears to concern only Plofsky's personal grievances, when the statement is viewed in the context in which it was made, it concerns the public.  Plofsky's comments regarding Rowland and the disciplinary action that followed was a highly publicized matter that garnered a great deal of public attention.  In light of this, the court finds that Plofsky's statement regarding the June 29 meeting, see number 3, supra, at 16, was on a matter of public concern.

Additionally, Plofsky's comments about the SEC's failure to follow Connecticut's FOIA requirements regarding public meetings, namely holding a meeting in executive session on July 9, is on a matter of public concern.  See number 4, supra, at 16. Holding closed meetings regarding an employee's discipline in violation of FOIA concerns the public, and their ability to witness actions taken by the SEC, and not just Plofsky.  While there is nothing in the record indicating that others were experiencing

---

[7] The defendants do not contest that Adler's statements, see numbers 2 and 3, supra, at 16, are Plofsky's for purposes of Plofsky's First Amendment claim.  Tr. Oral Arg. (2/26/09) at 9/13-22.

these violations or that the practices were systemic, the public still has an interest in its public agencies acting consistent with the law, particularly in the context in which this was occurring.

However, the act of hiring an attorney, see number 1, supra, at 16, does not concern the public nor do Adler's comments about the violation of Plofsky's due process rights, see number 2, supra, at 16, because "a generalized public interest in the fair or proper treatment of public employees is not enough." Ruotolo, at 189. Unlike in Mandell and Johnson, hiring a lawyer and being denied due process concerns only Plofsky, not the general public.

Having found that certain speech, numbers 3 and 4, supra, at 16, was on matters of public concern, the court will now turn to the question of whether the protected speech motivated his termination.

> 2.    Protected Speech motivated the adverse employment action.

"Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Mandell, 316 F.3d at 383 (citing Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). Temporal proximity is one way to provide an independent basis for an inference of causation. See id. at 384 ("it makes logical sense that if an employer wishes to retaliate by firing an employee, he is likely to do so soon after the event."). Moreover, "[s]ummary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." Morris, 196 F.3d at 110. In light of this, the court determines

21

that Plofsky adduced sufficient evidence of causation to create a triable question of fact on this issue.

The temporal proximity between the comments made by Adler regarding the June 29 meeting that were published in the <u>Hartford Courant</u> on July 7 and Plofsky's eventual termination on September 10 creates an issue of fact for the jury.  An inference can be drawn that, had that speech not occurred then, no further discipline would have occurred because the decision only to suspend Plofsky had already been made at the June 29 meeting.  In other words, a reasonable jury could find that because of the speech, the SEC decided to pursue further discipline against Plofsky. Indeed, it was not until the July 23 meeting that the stipulation related to the two week suspension was signed.  However, there are other facts in the record that give rise to an issue of fact that events that occurred between June 29 and September 10, which began with his protected speech, motivated Plofsky's termination.  For instance, taking the facts in the light most favorable to Plofsky, a reasonable jury could (albeit it not necessarily would) find Guiliano's comments at the July 23 meeting regarding the fact that Adler already had "made several comments to the press" are evidence of animus. Furthermore, there is evidence in the record that Guiliano had conversations with the whistleblowers regarding Adler's comment that Plofsky had nothing to do with the dissemination of the July 7 letter from the Attorney General, and the fact that Plofsky did not correct him.  <u>See</u>, <u>e.g.</u>, Bergeron Aff. ¶ 11; Sexton Aff. ¶ 9-10; Regula Aff. ¶ 14. If a jury is to credit those facts, it could infer that it is evidence of animus and a desire to retaliate against Plofsky.  Accordingly there are material issues of fact concerning causation in this case.

3.      Pickering Balancing Test

Because at least some of Plofsky's statements were on matters of public

concern and because causation can be established by the temporal proximity between

the speech and Plofsky's termination, the court turns to the third prong of a First

Amendment claim: whether the employee's speech was so disruptive that it justified

termination.  Indeed, "[a] government official may nonetheless fire an employee for

speaking on a matter of public concern if the employee's speech is reasonably likely to

disrupt the effective functioning of the office, and the employee is fired to prevent this

disruption."  Sheppard, 317 F.3d at 355.  To make this determination, courts must

balance the potential for disruptiveness in the workplace against a public employee's

First Amendment rights.  See, e.g., Connick, 461 U.S. at 150-53; Lewis v. Cohen, 165

F.3d 154, 161 ("This weighing, commonly referred to as the Pickering balancing test, is

necessitated by the State's dual role as employer and sovereign.").  This balancing test

requires courts to weigh the "interests of the [employee], as a citizen, in commenting

upon matters of public concern and the interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its employees."[8]

Sheppard, 317 F.3d at 355 (quoting Pickering, 391 U.S. at 568).  However, even if the

court finds that the Pickering balancing favors the employer, a First Amendment plaintiff

can establish liability "by proving that the employer disciplined the employee in

retaliation for the speech, rather than out of fear of the disruption.'"  Lewis, 165 F.3d at

_____

[8] The Second Circuit has stated that, "[w]hile as a general rule the [Pickering] test is a matter of law for the district court to apply, where there are questions of fact relevant to that application, this court has made known that 'we can envision cases in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior [to] the [district] court's application of the Pickering balancing test.'"  Johnson, 342 F.3d at 114 (2d Cir.2003) (citations omitted).

23

163).

The defendants concede this prong for summary judgment purposes because it cannot be said that Plofsky's speech regarding his discipline for his speech at the LWV was so disruptive as to justify his termination.  Tr. Oral Arg. (2/26/09) at 14/2-15/1.

Because there are material issues of fact with regard to some of Plofsky's speech, the Motion for Summary Judgment on the First Amendment grounds is denied.

B.    Procedural Due Process

The court now turns to Plofsky's procedural due process claim.  The Fourteenth Amendment's Due Process Clause prevents state officials from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV, sec. 1.  The Due Process Clause has been interpreted to have a procedural component that prevents states from depriving individuals of property interests without adequate procedural protection.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).  However, in order to be able to assert a procedural due process claim, an individual must identify a "property interest" of which he has been improperly deprived.[9] See id. at 538.

Identifying the property interest involved is the first step when considering a due process claim.  O'Connor v. Pierson, 426 F.3d 187, 196 (2d. Cir. 2005).  Property interests do not arise directly from the Constitution; they are instead created and defined by other sources.  Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005). "It is well established that the state-law property interest of government employees who may only be discharged for cause, such as tenured teachers, is a constitutionally

_____

[9] Plofsky has not argued that he was deprived of any "liberty" interest.

24

protected property interest for the purposes of the Fourteenth Amendment."  Id.  There is no dispute that Plofsky is a public employee who has a right not to be fired without just cause.  See Def.'s Mem. in Supp. at 23.  Thus, Plofsky's employment with the SEC was an established property interest.

The second step in analyzing a procedural due process claim is to determine whether the SEC provided Plofsky the process he was due.  O'Connor, 426 F.3d at 197.  Procedural adequacy turns on the pre- and post-deprivation procedures available.  Id.  With respect to pre-deprivation procedures, the Constitution requires that, at a minimum, the plaintiff be provided with notice and opportunity to be heard.  Loudermill, 470 U.S. at 546.  "Pre-deprivation process 'need not be elaborate;" its primary function is to serve as an 'initial check against mistaken decisions.'"  O'Connor, 426 F.3d at 198 (citing Loudermill, 470 U.S. at 545-46).  What is required pre-deprivation "can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings."  Loudermill, 470 U.S. at 545 (quoting Boddie v. Connecticut, 401 U.S. 371, 378 (1971)).  "[D]ue process does require that before being terminated an "employee [be given] oral or written notice of the charges against [him], an explanation of the employer's evidence, and an opportunity to present [his] side of the story."  Otero v. Bridgeport Housing Authority, 297 F.3d 142, 151 (2d Cir. 2002) (quoting Loudermill, 470 U.S. at 538-41) (emphasis in original).

Defendants argue that Plofsky was provided with adequate pre-deprivation process.  There is no dispute among the parties that Plofsky was provided with the charges against him and was given an opportunity, pre-deprivation, to address those charges.  The issue regarding the due process claim is therefore focused on Plofsky's

claim that defendants failed, pre-deprivation, to provide Plofsky with an explanation of the evidence against him because they did not provide him with copies of the whistleblower Affidavits.  Defendants argue that, to the extent that Plofsky complains that he should have been given copies of the whistleblower Affidavits, the defendants' decision to refuse disclosure was "reasonable and well-founded."  Def.'s Mem. in Supp. at 26.

Plofsky claims that he was denied due process when he was not provided with either the redacted Affidavits, or an explanation of the substance of the Affidavits, because due process requires that he be provided not only with the charges, but also an explanation of the evidence against him.  See, e.g., Loudermill, 470 U.S. at 538-41. Plofsky first asked for the unredacted Affidavits at the August 20 special meeting.[10] Def.'s Exh. 21.  This request was denied after the commissioners held a hearing in executive session.  Id.  As stated in the minutes, the reason for the denial was that "the Commission will not be able to redact the documents sufficiently to prevent the disclosure of the identity of the individuals."  Id.

On August 31, however, the whistleblower identities were revealed by the Hartford Courant.  Def.'s Exh. 26.  On that same day, Adler faxed a letter to Mazzola requesting "a list of specific allegations" made against Plofsky before he interviewed Plofsky.  Plofsky Aff. ¶ 19.  This request was again denied.  It is disputed as to why

---

[10] The minutes for this meeting indicate that Plofsky requested copies of the whistleblower "complaints."  Def.'s Exh. 21.  It appears to the court that the terms "complaints" and "affidavits" are used interchangeably.  However, the Complaints, see Def.'s Exh. 18, are memoranda written by JoAnna Sigbia, a principal auditor, who met with the three complainants and then summarized their complaints in the memoranda.  The Affidavits, see Def.'s Exh. 24, were sent to Guiliano on August 18, 2004, and signed by each whistleblower on August 18, 2004.  Thus, both the Affidavits and Complaints were available on August 20, 2004, when Plofsky first requested them.  It is this court's understanding that Plofsky requested copies of the Affidavits at the August 20 meeting.

Mazzola denied the request.  Yelmini states that she had numerous conversations with the Attorney General's Office about whether she could disclose redacted Affidavits, and they advised her that she could not.  Def.'s Exh. B at 40-52.  On the other hand, according to the Office of the Attorney General, the first communication on record with Yelmini regarding Plofsky was on September 8, 2004, Pl.'s Exh. CC at 6, which was well after these first two requests were made and denied.[11]

Mazzola presented his report on September 8 in closed session.  The meeting was not open to the public, according to the defendants, in an effort to protect the identities of the whistleblowers.  The meeting lasted for six hours behind closed doors.  Plofsky Aff. ¶ 22.

At the Loudermill hearing, Adler objected to the fact that Plofsky had still not been provided with an explanation of the evidence against him.  Def.'s Exh. 34 at 7-9.  Notwithstanding that, Plofsky addressed charges 1 through 4 laid out in the Loudermill notice.  After Plofsky addressed the SEC, Yelmini indicated that Mazzola wanted to present his findings to show that the "nature of the charges that were discussed as part of the investigation are substantially different than Mr. Plofsky is testifying . . . ."  Id. at 55.  Commissioner Collins also requested that Mazzola walk them through the

---

[11] It bears noting that defendants' attorney stated that she is not aware of any conversations between Yelmini and the Attorney General's Office prior to September 8.  Tr. Oral Arg. (2/26/09) at 21/9-22/3.  She argues that this is immaterial because Yelmini is not a defendant, and Yelmini did advise the SEC not to disclose the Affidavits, and they relied on her advice.  Id. at 22/6-14.

The record does not indicate the exact date on which Yelmini advised the SEC not to disclose the whistleblower complaints.  However, on August 20, the SEC held a meeting at which Yelmini was present.  Def.'s Exh. 21.  It was at this meeting that Plofsky requested redacted copies of the whistleblower complaints.  Id.  It could be inferred from Yelmini's deposition that she advised the SEC to deny this request during the executive session as a result of conversations that she had with the Attorney General's Office.  Def.'s Exh. B at 40-41.  Given it is the defendants' Motion for Summary Judgment, however, that inference cannot be drawn in defendants' favor.  At best, there is an issue of fact concerning what and when Yelmini told the commissioners about the whistleblower Affidavits.

allegations and discuss how other people's recollections of the incidents may have been different from that of Mr. Plofsky.  Id. at 57.  Adler objected, stating "[h]aving Mr. Mazzola reiterate whatever he already told you in closed session so that it can be on the public record is outrageous."  Id. at 58.  Adler later said that, if they chose to have Mazzola testify, then he asked that they give him the statements, a few hours to review them to decide how to respond, and a chance to examine the people who gave the statements.  Id. at 61-62.  Shortly thereafter, without granting Adler his requests, the SEC determined there was reasonable cause to terminate Plofsky.  Id. at 103-105.

Plofsky argues that, because much of the testimony the commissioners received was from Mazzola during the closed session, a reasonable jury could find that its decision was based on that hearing and Plofsky's remarks were not given "good faith" consideration.  See, e.g., id. at 98-99.  Defendants respond that Mazzola offered to present his evidence at the September 10 hearing, but Adler objected and put them in a difficult situation.

Additionally, Plofsky claims that, had he been provided with an opportunity to see the whistleblower Affidavits before the September 10 hearing, his responses to the charges as a whole and his overall presentation to those charges would have been completely different.  However, he admits that his statement about the events that were the subject of charges 1, 2, and 4 would not have changed based on the information contained in the unredacted Affidavits.  Plofsky Dep. at 119.  However, Plofsky argues he would have defended himself differently as to charge 3 which regarded Plofsky's alleged failure to inform the SEC that he played a role in the dissemination of the July 7 letter from the Attorney General to the Courant.  Plofsky

28

states that, without the Affidavits, he did not know that the "vast majority" of the Affidavits were about charge 3.  Id. at 117.  He claims that, without the Affidavits, he could have addressed the case law that they were relying on that mandated that he had a duty to correct the minutes from the July 23 meeting at which Adler stated that Plofsky had nothing to do with the dissemination of the July 7 letter to the Courant.  Id. at 117-118.  He believes that, had he known all of this, it would have "put everything in a different light."  Id. at 118.

Defendants argue that, during the Loudermill hearing, Plofsky demonstrated that he had ample notice of the charges against him because he spoke of each charge in great detail.  Def.'s Mem. in Supp. at 26.  However, the fact Plofsky defended himself to the best of his ability does not necessarily prove that the pre-deprivation process was constitutional.  See, e.g., Otero 297 F.3d at 152 ("Mere notice of the charge, however, is not an explanation of the evidence and does not necessarily suffice to provide due process.")  In Otero, the Court of Appeals for the Second Circuit admonished the district court for "equat[ing] 'explanation of the employer's evidence' simply with 'notice of the charge.'"  Id.  It further stated that the fact that the plaintiff knew what she was charged with was not enough to prove that she knew the evidence against her.  Id.  Similarly, the fact that Plofsky was provided with the charges against him is not enough to show that he was provided with the necessary pre-deprivation due process.  However, because this case is distinguishable from Otero and in light of other Second Circuit case law post Otero, the court holds that, on the undisputed record before it, Plofsky's due process rights were not violated.

In Otero, the employee was terminated after being accused of stealing a toilet

29

without ever being informed about the existence of the evidence against her, which included statements of her co-workers implicating her in the theft.  297 F.3d at 148. The Second Circuit ruled that, had she been provided with the statements of these witnesses, she could have pointed out "obvious inconsistencies in the statements underlying [the] accusation."  Id. at 152.  The employee in Otero was never provided an opportunity to see the evidence against her.  Here, while Plofsky was not provided with the Affidavits prior to defending himself against the charges at the September 10 hearing, at the reconsideration hearing,[12] after being provided copies of the Affidavits, Adler was provided an opportunity to address charge 3.[13]  While MacGill requested that he limit his statements to how the new Affidavits "materially change[d]" the basis on which the SEC based its decision, see Def.'s Exh. 44 at 5, Adler did address charge 3 in detail and in doing so referred to both the original Affidavits and the new Affidavits. Adler explained why he made the statement that Plofsky was not involved in the dissemination of the letter.  See id. at 11.  He also addressed the issue of whether Plofsky had a duty to correct what Adler said at the July 23 meeting.  Id. at 13-15. Thus, while the employee in Otero was never provided the evidence against her, Plofsky was provided, very shortly after termination, the opportunity to view the evidence against him and defend against it at the reconsideration hearing.  See

_____

[12] The court considers the reconsideration hearing a part of the pre-deprivation procedure because the "primary function" of pre-deprivation procedure "is to serve as an 'initial check against mistaken decisions.'"  Although the September 29 hearing came after the termination, it provided Plofsky an opportunity to "check" the "mistaken decision."  O'Connor, 426 F.3d at 198 (citing Loudermill, 470 U.S. at 545-46).

[13] Adler addressed essentially the same things that Plofsky stated he would have addressed at the September 10 hearing had he been permitted to see the Affidavits prior to the hearing.  See Plofsky Dep. at 117-119.

30

Saltarella v. Town of Enfield, 427 F.Supp. 2d 62, 74 (D. Conn. 2006) (finding that requirement that employee be given an explanation of the evidence against him was met when employee was given thirty minutes, at his termination hearing, to read the evidence against him.), aff'd, 227 Fed. Appx. 67 (2d Cir. 2007).

In addition, at the September 10 Loudermill hearing, Plofsky could have heard Mazzola's report of what others, including the whistleblowers, were saying about the charges.  See pp. 27-28, supra.  While that report would have come after Plfosky's defense, he may still have had the opportunity to respond to the content of the report and what others (the whistleblowers) were claiming as to the charges.  Thus, the opportunity to hear an explanation of the evidence was offered to Plofsky pre-termination, and he actually obtained copies of the Affidavits, admittedly post-termination, but only shortly thereafter, and was able to address the Affidavits at a meeting called to reconsider the termination decision.  For all these reasons, the court views Otero as distinguishable.

Further, a Second Circuit decision, Adams v. Thomas Association, 517 F.3d 124, 128 (2d Cir. 2008), decided after Otero, suggests that, in the context of public employees with full post-termination procedures, notice of the termination is sufficient pre-termination process.  See also Van Wormer v. City of Rensselaer, 293 Fed. Appx. 783 (2d Cir. 2008) (stating that employee "failed to identify any inadequacy in the process that he was due and received after the disciplinary charges were brought" against him.) (emphasis added).  In Loudermill, the court rested its ruling in part on the fact that extensive post-deprivation proceedings were afforded the employee.  See Loudermill, 470 U.S. at 548 n.12 ("the existence of post-termination procedures is

31

relevant to the necessary scope of pre[-]termination procedures."); see also Locurto v.

Safir, 264 F.3d 154, 171 (2d Cir. 2001) ("when such a public employee is terminated,

procedural due process is satisfied if the government provides notice and a limited

opportunity to be heard prior to termination, so long as a full adversarial hearing is

provided afterwards.").  Defendants contend, and the court agrees, that the post-

deprivation proceeding, the post-termination hearing before the ERB, satisfies the

Loudermill requirements.[14]  Def.'s Mem. in Supp. at 27.  It is well-established that the

existence of post-deprivation procedures inform the necessary scope of the pre-

deprivation procedures, Loudermill, 470 U.S. at 547 n.12.  Indeed, there is no due

process violation where "pre-deprivation notice is provided and the deprivation at issue

can be fully remedied through the grievance procedures provided for in the collective

bargaining agreement."  Adams, 517 F.3d at 128 (finding no procedural due process

violation because the county provided the plaintiff with notice of the deprivation and the

collective bargaining procedures could have remedied the alleged deprivation); see also

Wojick v. Mass. State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir. 2002) (finding due

process requirements met in a termination case because "[employee] was given an

opportunity to respond to allegations of misconduct prior to his termination" and "he had

ample opportunity to test both the fairness of his termination and the quality of this

evidence offered against him" at the post-termination arbitration) (cited with approval in

Adams, 517 F.3d at 128).

　　　　This case falls within the holdings of Adams and Wojcik.  On October 1, 2004,

---

[14] Plofsky has not asserted any argument that the ERB proceeding was procedurally inadequate.
See, e.g., Narumanchi v. Bd. of Trustees of the CT State University, 850 F.2d 70, 72 (2d Cir. 1988).

Adler filed a grievance related to his termination.  On October 5, he filed an appeal of his dismissal with the ERB.  After numerous days of hearings and testimony from many people, the ERB issued a Memorandum of Decision on March 31, 2006, that held Plofsky's termination was without reasonable cause.  Def.'s Exh. 52.  As a result, Plofsky was awarded all retroactive salary and benefits, and the ERB ordered that he be reinstated to active employment with the State of Connecticut.  Id.  This post-termination hearing satisfied the requirements of due process.

Accordingly, summary judgment on Plofsky's procedural due process claim is granted.

C.    Affirmative Defense of Qualified Immunity

The court next addresses the defendants' claim that qualified immunity shields them, as SEC commissioners, from individual liability for the federal violations alleged in this suit.  Generally, qualified immunity insulates government officials from personal liability when they perform discretionary duties pursuant to their official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The purpose of qualified immunity is to shield government officials "from liability for their performance of discretionary actions and offers them the benefit of avoiding costly, time-consuming and, ultimately unsuccessful litigation."  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).

Determining whether an official has qualified immunity requires a two-prong

analysis.[15]  Saucier v. Katz, 533 U.S. 194, 201 (2001).  First, the court asks whether

plaintiff's allegations, if true, establish a constitutional violation.  Id.  If a constitutional

violation could be made out on a favorable view of the plaintiff's submissions, the court

then asks whether the right was clearly established.  Id.  "If the right at issue was not

clearly established . . . then qualified immunity shields the defendant."  Walczyk v. Rio,

496 F.3d 139, 154 (2d Cir. 2007).

First, the court must ask if, "[t]aken in the light most favorable to the party

asserting the injury, do the facts alleged show the [defendants'] conduct violated a

constitutional right."  Saucier, 533 U.S. at 201.  The court finds that, when the record is

construed in a light most favorable to Plofsky, he has established that he was retaliated

against as a result of his speech on matters of public concern, which is a constitutional

violation.  See Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). Therefore, the court will

turn to the second step of the inquiry with respect to the First Amendment claim.[16]  The

second step in the determination of whether a government official is entitled to qualified

immunity is whether the right alleged to have been violated was "clearly established."

Id.  "This inquiry turns on the objective legal reasonableness of the action, assessed in

light of the legal rules that were clearly established at the time it was taken."  Pearson,

129 S. Ct. 808, 822 (2009).

---

[15] Recently the Supreme Court held in Pearson v. Callahan, 129 S.Ct. 808, 818 (2009), that the Saucier sequence–placing first the question of whether a constitutional violation was pled –is no longer mandatory.  However, it also stated that the "decision does not prevent the lower courts from following the Saucier procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases."  Id. at 821.  It is this court's view that the Saucier sequence is appropriate in this case.

[16] Because Plofsky was provided with adequate due process as a result of his post-termination hearing with the Employee Review Board, it is unnecessary to address the defendant's defense of qualified immunity as it applies to the due process claim.

"It has long been established that a government employee's right to speak on issues of public concern is protected from retaliation if the speech does not disrupt the administration of the government."  <u>Catletti v. Rampe</u>, 334 F.3d 225, 231 (2d Cir. 2003). Defendants adduce no argument that persuades the court that it was not "clearly established" that retaliation for Plofsky's comments on matters of public concern is unlawful.  Instead, defendants principally argue that they are entitled to qualified immunity because their actions were "objectively reasonable" in light of the legal rules clearly established at the time.  Specifically, they argue that it was "objectively reasonable to believe that [the] law did not protect employee speech related to their own personal grievances."  Tr. Oral Arg. (2/26/09) at 29/4-7.  While that may be true, it misses the mark in this case.  The court has determined that Plofsky established that some of his speech was on matters of public concern; thus, the ground for their qualified immunity argument is inapposite.  Second, the question at this stage is merely whether the law was clearly established, and there is no argument from the defendants that it was not when the employee's speech is on a matter of public concern. Accordingly, if it is true, as asserted by Plofsky, that the defendants acted deliberately to bring about Plofsky's termination in retaliation for his speech on matters of public concern, defendants cannot avail themselves of qualified immunity.  Thus, summary judgment in favor of the defendants as to the First Amendment claim on qualified immunity grounds is denied.

      D.    <u>Spoilation</u>

      Finally, Plofsky argues that he is entitled to an adverse evidentiary inference as a result of spoliation of evidence by four out of the eight defendants. Pl.'s Mem. in Opp. at

72-80.  A party seeking an adverse inference based on spoliation must establish "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind;' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find it would support that claim or defense." Residential Funding Corp. v. Degeorge Fin. Corp, 306 F.3d 99, 107 (2d Cir. 2002) (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 107-12 (2d Cir. 2001)).

With respect to the due process claim, Plofsky argues that defendants destroyed notes and documents related to Plofsky.  Pl.'s Mem. in Opp. at 72-80.  However, more evidence would not change this court's view that the process afforded Plofsky satisfied the requirements of due process.  Thus, the documents the defendants allegedly destroyed were not relevant to Plofsky's due process claim.  The request for the adverse inference as a result of spoliation with respect to the due process claim is therefore denied.

Because the court has already determined that there are genuine issues of fact concerning Plofsky's First Amendment claim that survive summary judgment, the court need not address the request for an adverse inference based on spoliation.  The court did not need to make such an inference in order to arrive at its decision to deny summary judgment.  Thus, the court denies the request for adverse inference as moot without prejudice to renew pre-trial.

**V.    CONCLUSION**

For the foregoing reasons, defendants' Motion for Summary Judgment (Doc. No. 56) is **DENIED** with respect to the First Amendment claim and **GRANTED** with respect

to the procedural due process claim.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 26th day of March, 2009.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge